AO 91 (Rev. 11/11) Criminal Complaint

Trial Attorney Daniel Griffin (312) 469-6307





## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

BAQAR HUSSAIN RAVZ SYED

CASE NUMBER:   23-cr-00385

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. In or about March 2023 through June 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, BAQAR HUSSAIN RAZV SYED, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1347 | did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is Medicare, and for obtaining by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of or payment for health care benefits, items, and services |

This criminal complaint is based upon these facts:

 X   Continued on the attached sheet.

*Travis Fannin*

TRAVIS L. FANNIN
Special Agent, FBI

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 2, 2023

7:53 p.m.   *Heather K. McShain*

*Judge's signature*

City and state: Chicago, Illinois

HEATHER K. MCSHAIN, U.S. Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Travis L. Fannin, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for four years. My current responsibilities include the investigation of white-collar crime, including mail, wire, health care, and bank fraud.

2.      This affidavit is submitted in support of a criminal complaint alleging that BAQAR HUSSAIN RAZV SYED ("SYED") has violated Title 18, United States Code, Section 1347. As described in more detail below, there is probable cause to believe that SYED has knowingly and willingly defrauded the Medicare program ("Medicare") by causing to be submitted false claims for reimbursement of over-the-counter ("OTC") COVID-19 test kits allegedly provided to Medicare beneficiaries, which services were never provided, and fraudulently obtained money from Medicare.

3.      The investigation of SYED is being conducted jointly by the FBI, the United States Secret Service, and the United States Department of Health and Human Services, Office of the Inspector General (HHS-OIG). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SYED with health care fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only

the facts that I believe are necessary to establish probable cause to believe that
SYED committed the offense alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information
provided to me by other law enforcement officers, and information I have received
from various business records and searches of public and governmental databases.

## FACTS SUPPORTING PROBABLE CAUSE

### A.     OVERVIEW OF INVESTIGATION

5.     This investigation began in April 2023, when law enforcement agencies
detected a massive spike in billing for OTC COVID-19 tests, followed by thousands
of complaints from Medicare beneficiaries who did not receive the OTC COVID-19
test kits ("COVID Test Kits"). The investigation concerns a group of twelve
laboratories, including Luna Labs LLC ("LUNA LABS"), located in the Chicagoland
area that billed for COVID Test Kits that were never provided.

6.     As part of this investigation, the government submitted an affidavit in
support of a seizure warrant for five bank accounts associated with LUNA LABS.
On June 23, 2023, Magistrate Judge Jeffrey Cole signed the seizure warrant, 23 M
630, for certain accounts associated with LUNA LABS. The seizure warrant
application, attached as Exhibit 1, is incorporated by reference and is referred to as
the "Luna Labs Seizure Application."

7.     In summary, the Luna Labs Seizure Application provided probable
cause to believe that five accounts associated with LUNA LABS, "Subject Accounts
1-5", contained proceeds of fraudulent Medicare billings by LUNA LABS for COVID

Test Kits that were either: (a) not delivered to the Medicare beneficiaries, or (b) delivered to Medicare beneficiaries who did not agree to, or approve of, delivery of the COVID Test Kits to their homes.

8.     As further described in Exhibit 1, probable cause was established on the basis of: (a) beneficiary complaints and interviews which indicated that LUNA LABS billed for COVID Test Kits that were not delivered, (b) billing by LUNA LABS for COVID Test Kits that were purportedly delivered to beneficiaries known to be deceased, (c) observation of the LUNA LABS office site on June 5, 2023, (d) analysis of Medicare claims data which demonstrated a dramatic spike in Medicare billing over 13 weeks that was inconsistent with LUNA LABS activity in the months prior to a change in ownership, and (e) review of financial records for accounts associated with LUNA LABS which did not reflect financial activity consistent with the operation of a large scale COVID Test Kit delivery business.

9.     Execution of the warrants on or about June 23, 2023, resulted in the seizure of over $3.7 million from Subject Accounts 1-5.

10.    This affidavit contains additional information relating to the operation of LUNA LABS and ownership and control of funds fraudulently obtained from Medicare for the purpose of establishing probable cause to arrest SYED. In order to more effectively do so, Subject Accounts 1-5 are further described in this affidavit as follows:

| Subject Account 1 | Luna Labs Account | JP Morgan Chase x6715 |
|---|---|---|
| Subject Account 2 | HCMM Account 1 | JP Morgan Chase x7536 |
| Subject Account 3 | HCMM Account 2 | Bank of America x8053 |
| Subject Account 4 | HCMM Account 3 | US Bank x1458 |
| Subject Account 5 | Syed Account | JP Morgan Chase x2525 |

11.     SYED is the only authorized signer on HCMM Accounts 1-3 and the Syed Account. SYED is not a signer on the Luna Labs Account, but I submit that facts below demonstrate that after he purchased LUNA LABS from its previous owners, SYED controlled the Luna Labs Account.

**BACKGROUND**

**A.     LUNA LABS LLC**

12.     According to the Illinois Secretary of State, SYED is the manager of LUNA LABS, which was formed on or about January 17, 2022.  At the time of its formation, Individual 1 was listed as the "Registered Agent."  The initial Managers listed were Individual 1, Individual 2, Individual 3, Individual 4, Individual 5 and Individual 6.

13.     On or about March 3, 2023, Articles of Amendment were filed for LUNA LABS with the Illinois Secretary of State's office to admit a new manager, SYED, and

withdraw the six initial managers—Individuals 1-6.[1]

14.     According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), LUNA LABS is a registered provider with Medicare.

**B.     BAQAR HUSSAIN RAZV SYED**

15.     According to the Illinois Secretary of State, HEALTH CARE MANAGEMENT & MARKETING LLC ("HCMM") was formed on April 1, 2023. The "Registered Agent" and "Manager" is listed as SYED. The address provided for the Registered Agent and the Manager is listed as 4905 Crain Street, Apartment 2C, Skokie, Illinois, which is also the address listed on SYED's driver's license, and believed to be his residence. As previously noted above, SYED is the only authorized signer on HCMM Accounts 1-3 and Syed Account.

**C.     INTERVIEW OF FORMER OWNER – INDIVIDUAL 2**

16.     On June 28, 2023, law enforcement officers interviewed Individual 2, a former owner of LUNA LABS. Individual 2 stated that he owned LUNA LABS, along with four other individuals, until February 17, 2023, when it was sold to SYED.

17.     Individual 2 stated that on or about February 17, 2023, he, along with LUNA LABS's biller, Biller 1, met with SYED. Individual 2, on behalf of LUNA LABS, entered into a purchase and sale agreement with SYED, which SYED signed. The purchase and sale agreement was also signed by Individual 1, the Registered Agent

---

[1] On or about March 8, 2023, Articles of Amendment were again filed for LUNA LABS with the Illinois Secretary of State's office that appeared to substantially make the same changes as the articles filed on March 3, 2023. The only additional change was that the "Registered Agent" was also changed from Individual 1 to SYED.

of LUNA LABS, and SYED. Individual 2 provided a copy of the signed purchase and sale agreement with SYED to the government.

18.     Individual 2 took a photograph of SYED's driver's license and social security card. Individual 2 told law enforcement officers that SYED paid approximately $140,000 for LUNA LABS, mostly in cash and the remaining in checks.

### D.     INTERVIEW OF FORMER BILLER – BILLER 1

19.     On July 2, 2023, law enforcement agents interviewed the former biller of LUNA LABS, previously identified as Biller 1. Biller 1 stated that she met SYED one time, on the day that he purchased LUNA LABS. Biller 1 stated that she wrote down the PECOS username and password for LUNA LABS, the National Provider Identifier ("NPI") number, and the Tax ID. Biller 1 gave the piece of paper with that information to SYED.

20.     Biller 1 stated that she never heard from or saw SYED after the date of the sale of LUNA LABS. Biller 1 did not receive any calls or communications from anyone purporting to be the biller of LUNA LABS.

21.     According to Biller 1, he/she did make a phone call to a Centers for Medicare and Medicaid ("CMS") contractor, as she noticed that SYED did not remove the former owner, Individual 1, from any of the PECOS documentation, as required by Medicare.

### E.     REVIEW OF FINANCIAL RECORDS

22.     Financial analysis conducted of the five accounts associated with LUNA LABS demonstrated that SYED controlled the inflow and outflow of funds from Subject Accounts 1-5. Thus, SYED was aware of the activity in each of the Subjects Accounts, to include where funds were being sent and where funds were not being sent. Additionally, SYED was the sole signer on HCMM Accounts 1-3 and Syed Account, each of which were opened after SYED had purchased LUNA LABS.

23.     Financial records showed that between on or about January 1, 2023, and May 31, 2023, approximately $14,408,777.83 was deposited from Medicare into the Luna Labs Account. A review of Medicare claims data showed that approximately $31,473,196.09[2] was paid to LUNA LABS during this same time-period. The primary reason for the difference between the two amounts is due to Medicare placing approximately $17,122,653.20 into escrow due to indicators of potential fraud, which funds Medicare will not release until its pending investigation is resolved.

*Luna Labs Account[3]*

24.     A detailed review was conducted to assess the financial activity in the Luna Labs Account as it related to COVID Test Kits purportedly provided by LUNA

---

[2] From this amount, approximately $31,472,817.60, or over 99.9% of its billing during the referenced time-period, was billed by LUNA LABS under HCPCS K1034; that is, for purported delivery of COVID Test Kits.

[3] On July 2, 2023, law enforcement interviewed Individual 1, the former Registered Agent of LUNA LABS who stated that SYED went to JP Morgan Chase and removed the former owners from the Luna Labs Account. After SYED removed the former owners from the Luna Labs Account, the former owners could not access the account. Additionally, the email and phone number listed for the Luna Labs Account for JP Morgan Chase are the same email and phone number listed for the SYED Account.

LABS from February 2023 to May 2023. Bank statements revealed that, for the months of January 2023 to February 2023—that is, prior to SYED's purchase of LUNA LABS—deposits into the Luna Labs Account averaged $10,349.24 and debit activity averaged $102,991.68. At the end of February 2023, the Luna Labs Account contained a balance of $0.00.

25. Thereafter, beginning in early March 2023, shortly after SYED's purchase of LUNA LABS, its Medicare claims—almost entirely premised on purportedly supplying COVID Test Kits—increased at abnormal levels. Based on my training and experience, a low account balance in the Luna Labs Account due to comparatively small amounts of funds moving in and out of the account is inconsistent with a legitimate business planning a multi-million-dollar spike in its lab testing business the following month.

26. Further review of the Luna Labs Account revealed that deposit and debit activity conducted by SYED began on March 8, 2023, when $400 was deposited into the account by an individual who signed the deposit slip "BAQAR." The deposit and debit activity increased in March 2023, which is consistent with SYED taking ownership of LUNA LABS and its surge in billing for COVID Test Kits .

*Vendor Analysis from Luna Labs Account*

27. Continued analysis of debit activity in the Luna Labs Account for the period of March 2023 to May 2023, however, does not reflect financial activity indicative of a legitimate lab business. A detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically

expected with the operation of supplying COVID Test Kits, such as test kit purchases, packaging fees, and/or storage fees. There were no payments to any FedEx shipper, UPS, DHL, the USPS, or any other known shipping entity. There were no payments to any identifiable billers or billing entities. There were no payments for postage. There were no payroll payments to employees or a payroll service provider. There was one limited expense after SYED took ownership, totaling $1,600, that could be conclusively attributed to rent payments in calendar year 2023.

*Movement of funds from Luna Labs Account*

28.     LUNA LABS financial records show a pattern of rapidly disbursing funds received from Medicare payments into the Luna Labs Account, often to bank accounts controlled by SYED, including HCMM Account 1, HCMM Account 2, HCMM Account 3 and Syed Account.

29.     For instance, bank statements for the Luna Labs Account show approximately $3.1 million in deposits from Medicare for April 2023, and $3.2 million in withdrawals. Bank statements for the Luna Labs Account show approximately $11.3 million in deposits from Medicare for May 2023, and approximately $11.3 total withdrawals.

*Use of Proceeds from Luna Labs Account*

30.     On April 3, 2023, the Luna Labs Account electronically sent $250 to a Coinbase account in the name of "Baqar Hussain Razv Syed."

31.    That same day, the Luna Labs Account sent a "Domestic Wire Transfer" of $400,000 to a Bank of America account x9593 in the name of "Baqar Hussain Razv Syed."

32.    On April 3, 2023, and April 5, 2023, there were a combined total of four cash withdrawals from the Luna Labs Account totaling $91,000. The signature on the withdrawal slips is "Baqar." The signature appears to match the signature of SYED on the sale and purchase agreement for LUNA LABS, dated February 17, 2023, and the signature on SYED's driver's license.

*HCMM Accounts*

33.    HCMM Account 1, HCMM Account 2, and HCMM Account 3 are bank accounts held under the account name HCMM.  As previously referenced, Illinois Secretary of State records list SYED as the "Registered Agent" and "Manager" of HCMM. SYED is the sole signer on these accounts, which were opened between April 3, 2023 and April 6, 2023.

*HCMM Account 1 Movement of Funds*

34.    HCMM Account 1 appears to be a pass-through account for the flow of Medicare funds derived from the practice of billing Medicare for COVID Test Kits that were not delivered or requested.  Funds from HCMM Account 1 were transferred to HCMM Account 3 and the Syed Account.

35.    A review of HCMM Account 1 indicated that between April 3, 2023, and May 31, 2023, approximately $11,732,201.42 was transferred from the Luna Labs Account to HCMM Account 1. Total deposits, less reversals, into HCMM Account 1

during the relevant period was approximately $11,802,201.42. Thus, deposits from the Luna Labs Account total approximately 99% of all deposits into HCMM Account 1 during this period.

36.     Bank statements for HCMM Account 1 show approximately $2.37 million in deposits for April 2023, and $1.09 million in withdrawals. Bank statements for HCMM Account 1 show approximately $10.58 million in deposits from Medicare for May 2023, and approximately $6.87 million in total withdrawals.

*HCMM Account 1 Vendor Analysis*

37.     Similarly to the Luna Labs Account, analysis of debit activity in HCMM Accounts for the period of March 2023 to May 2023, does not reflect financial activity indicative of a legitimate lab business. A detailed review was unable to conclusively identify a large and consistent stream of expenses tied to business activities typically expected with the operation of supplying COVID Test Kits, such as test kit purchases, packaging fees, and/or storage fees. There were no payments to any FedEx shipper, UPS, DHL, the USPS, or any other known shipping entity. There were no payments to any identifiable billers or billing entities. There were no payments for postage. There were no payroll payments to employees or a payroll service provider.

*HCMM Account 1 Use of Funds*

38.     On May 3, 2023, HCMM Account 1 bank statements show a withdrawal of $50,000. The withdrawal slip is signed by "Baqar." On May 15, 2023, HCMM Account 1 bank statements show a withdrawal of $100,000. The withdrawal slip is signed "Baqar." Both signatures appear to match the signature of SYED on the sale

and purchase agreement for LUNA LABS, dated February 17, 2023, and the signature on SYED's driver's license.

39.     On May 3, 2023, HCMM Account 1 bank statements reveal two wires to the Syed Account for $15,000 and $135,000.

40.     On May 8, 2023, HCMM Account 1 bank statements reveal a wire to the Syed Account for $250,000. On May 16, 2023, HCMM Account 1 bank statements reveal a wire to the Syed Account for $500,000.

*Other HCMM Accounts*

41.     Between March 2023 and May 2023, the Luna Lab Account sent check payments, wire transfers, and electronic funds transfers to HCMM Account 1 and HCMM Account 2.

42.     On April 18, 2023, $500,000 was transferred from the Luna Lab Account to HCMM Account 2, by way of a "Domestic Wire Transfer." Given the lack of an apparent business relationship between the two entities, as well as the shared ownership by SYED, this transfer is indicative of an attempt to conceal and shield the fraudulently obtained Medicare deposits.

43.     Further review of HCMM Account 1 for the period from April 3, 2023, through May 31, 2023, showed that the funds in the account were rapidly depleted into entities controlled by SYED. Funds totaling $900,000 were transferred by four electronic funds transfers from HCMM Account 1 to the Syed Account in May 2023.

44.     On June 12, 2023, a $2,828,492.97 cashier's check was drawn off HCMM Account 1 deposited in HCMM Account 3.

*Syed Account*

45.    The Syed Account is held in SYED's name.

46.    SYED directly profited from the extensive billing by LUNA LABS. On May 8, 2023, HCMM 1 sent one transfer of $250,000 to the Syed Account. That same day, May 8, 2023, bank records indicate that $250,000 was transferred from the Syed Account to SYED's Coinbase account. On May 16, 2023, HCMM1 sent one transfer of $500,000 to the Syed Account. That same day, May 16, 2023, $500,000 was transferred from the Syed Account to SYED's Coinbase account.

47.    SYED executed the scheme to defraud Medicare numerous times by submitting false and fraudulent claims to Medicare for purportedly supplying COVID Test Kits through LUNA LABS to Medicare beneficiaries.  For example, on or about April 13, 2023, LUNA LABS submitted a claim to Medicare for supplying a COVID Test Kits to Medicare beneficiary S.P., which S.P. did not receive. *See* Exhibit 1 at 10-11. On or about May 12, 2023, LUNA LABS submitted a claim to Medicare for supplying COVID Test Kits to Medicare beneficiary K.H., which K.H. did not receive. *See* Exhibit 1 at 11.

48.    In summary, according to witnesses and records obtained by law enforcement, LUNA LABS and its owner, SYED, submitted and caused to be submitted false and fraudulent claims to Medicare for supplying COVID Test Kits tests though various means, including charging Medicare for supplying COVID Test Kits to beneficiaries who never received, and/or never wanted such kits. SYED had access to the PECOS username and password for LUNA LABS. SYED controlled the

bank accounts associated with LUNA LABS and therefore was aware of the millions of dollars of deposits into the Luna Labs Account. SYED controlled the bank accounts to where LUNA LABS transferred a significant portion the funds. SYED personally benefitted from the millions of dollars in deposits from Medicare.

49.     Based upon the foregoing facts, namely that SYED submitted false and fraudulent claims to Medicare for COVID Test Kits that were never provided, I submit that there is probable cause to believe that BAQAR HUSSAIN RAZV SYED committed health care fraud, as alleged in the Complaint.

FURTHER AFFIANT SAYETH NOT.

*Travis Fannin*

TRAVIS L. FANNIN
Special Agent, FBI

SWORN TO AND AFFIRMED by telephone July 2, 2023.

7:53p.m.

Honorable HEATHER K. MCSHAIN
United States Magistrate Judge

# Exhibit 1

AO 108 (Rev 06/09) Application for a Warrant to Seize Property Subject to Forfeiture          Trial Attorney Daniel Griffin, (312) 469-6307

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Seizure of:

Funds not to exceed $31,474,228.80 in the following accounts held by JP Morgan Chase, US Bank, and Bank of America:

| |
|---|
| JP Morgan Chase account in the name of Luna Labs, LLC account number 797076715 (Subject Account 1) |
| JP Morgan Chase account in the name of Health Care Management and Marketing LLC account number 939197536 (Subject Account 2) |
| Bank of America account in the name of Health Care Management and Marketing LLC account number 291037538053 (Subject Account 3) |
| US Bank account in the name of Health Care Management and Marketing LLC account number 199384271458 (Subject Account 4) |
| JP Morgan Chase account in the name of Baqar Hussain Razv Syed account number 939212525 (Subject Account 5) |

**UNDER SEAL**

Case No.: 23M630

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Karl Kraywinkle, a federal law enforcement agent, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the Northern District of Illinois is subject to forfeiture to the United States of America under 18 U.S.C. §§ 981(a)(1)(D) and (b)(3):

The property described in the caption of this application.

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

*Karl Kraywinkle*

_____
*Applicant's signature*

Karl Kraywinkle, Special Agent, FBI
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone,

Date:  June 23, 2023    at  2:45pm

_____
*Judge's signature*

City and state:  Chicago, Illinois

JEFFREY        COLE,        U.S.        Magistrate Judge

*Printed name and title*

UNITED STATES DISTRICT COURT    )
    )
NORTHERN DISTRICT OF ILLINOIS    )

### AFFIDAVIT

I, KARL D. KRAYWINKLE, being duly sworn, state as follows:

## I.   **BACKGROUND OF AFFIANT**

1.    I am a Special Agent employed by the Federal Bureau of Investigation (FBI). I have been so employed since April 2011.

2.    My duties and responsibilities as an FBI Special Agent include conducting criminal investigations of individuals and organizations that have violated federal laws, including violations of Title 18, United States Code 1347 (health care fraud) and Title 18, United States Code 1349 (conspiracy to commit health care fraud). I also investigate allegations of fraud, waste, and abuse in connection with federal and state health care programs, including Medicare and Medicaid. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple federal search warrants and arrests.

3.    This affidavit is made in support of an application for a warrant to seize and preserve for forfeiture any and all funds up to $31,474,228.80 maintained in any and all of the following bank accounts: JPMorgan Chase Bank, NA, bank account number xxxxx6715, held in the name of LUNA LABS, LLC ("**Subject Bank Account 1**"); JPMorgan Chase Bank, NA, bank account ending in xxxxx7536, held in the name of HEALTH CARE MANAGEMENT AND MARKETING LLC ("**Subject Bank Account 2**"); Bank of America

account number xxxxxxxx8053, held in the name of HEALTH CARE MANAGEMENT & MARKETING LLC ("**Subject Bank Account 3**"), US Bank account number xxxxxxxx1458, held in the name of HEALTH CARE MANAGEMENT AND MARKETING LLC ("**Subject Bank Account 4**"), and JPMorgan Chase Bank, NA, bank account number xxxxx2525, held in the name of BAQAR HUSSAIN RAZV SYED ("**Subject Bank Account 5**"). These funds (the "**Subject Funds**") constitute and are derived from proceeds traceable to violations of Title 18 United States Code, Sections 1343 (wire fraud), 1347 (health care fraud), 1956(a)(2) (money laundering) and 1957 (money laundering) (the "**Subject Offenses**"), and therefore are subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 984, Title 18, United States Code, Sections 982(a)(2)(A), and Title 28, United States Code, Section 2461(c).

4. The statements in this affidavit are based on my personal knowledge, my training and experience, and information obtained from other law enforcement officers and witnesses. As this affidavit is being submitted for the limited purpose of securing the above-referenced seizure warrants, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause that the **Subject Funds** constitute and are derived from proceeds traceable to violations of the **Subject Offenses** and are being held in the **Subject Bank Accounts.**

2

II.  **LEGAL AUTHORITY FOR SEIZURE AND FORFEITURE**

5.      Title 18, United States Code, Sections 981(a)(1) and (b)(3) authorize civil forfeiture of property, real or personal, which constitutes or is derived to proceeds traceable to a violation of, among other offenses, Title 18 United States Code, Sections 1343 (wire fraud), 1347 (health care fraud), 1956(a)(2) (money laundering), and 1957 (money laundering), pursuant to a seizure warrant in any district in which an act or omission giving rise to the forfeiture occurred.

6.      Title 18, United States Code, Section 984 permits civil forfeiture of fungible property such as cash or monetary instruments in bearer form.  Specifically, it permits the forfeiture of fungible property without directly tracing the property to the criminal offenses if such funds are seized from the same account as the property involved in the offense so long as the forfeiture action is commenced within one year from the date of the offense.

7.      Title 28, United States Code, Section 2461(c) provides that if a person is charged and convicted in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, a court shall order as part of the defendant's sentence, the forfeiture of any such property that is authorized by the violation for which the defendant was convicted and notice of intent to seek forfeiture was provided by the government.

8.      Title 18, United States Code, Section 982(a)(1) authorizes criminal forfeiture of property, real or personal, involved in a violation of, among other offenses, Title 18, United States Code, Section 1957 (money laundering), and any

3

property traceable to such property.

## III. __BACKGROUND__

### A. __LUNA LABS LLC__

9.      According to the Illinois Secretary of State, LUNA LABS LLC was incorporated on or about January 17, 2022. At the time of its organization, ROSHAN PATEL was listed as the "Registered Agent." The initial Managers listed were JISIT ZAVERI, RUPESHKUMAR PATEL, KINNAR PATEL, BHAVIN PATEL, JIGNASA PATEL and ROSHAN PATEL.

10.     On or about March 3, 2023, Articles of Amendment were filed for LUNA LABS LLC with the Illinois Secretary of State's office to admit a new manager, BAQAR HUSSAIN RAZV SYED, and withdraw all six initial managers, JISIT ZAVERI, RUPESHKUMAR PATEL, KINNAR PATEL, BHAVIN PATEL, JIGNASA PATEL and ROSHAN PATEL.[1]

11.     According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), LUNA LABS LLC is a registered provider with Medicare. As part of PECOS, there is an electronic funds transfer (EFT) agreement. According to the EFT agreement, Medicare monies for claim reimbursement by LUNA LABS LLC are to be electronically deposited into **Subject Bank Account 1** starting on or about July 4, 2022.

---

[1] On or about March 8, 2023, Articles of Amendment were again filed for LUNA LABS LLC with the Illinois Secretary of State's office that appeared to substantially make the same changes as the articles filed on March 3, 2023. The only additional change was that the "Registered Agent" was also changed from ROSHAN PATEL to BAQAR HUSSAIN RAZV SYED.

### B.     HEALTH CARE MANAGEMENT & MARKETING LLC

12.     According to the Illinois Secretary of State, HEALTH CARE MANAGEMENT & MARKETING LLC was incorporated on April 1, 2023.  The "Registered Agent" and "Manager" is listed as SYED BAQAR HUSSAIN RAZV.  The address of the Registered Agent is listed as 4905 Crain Street, Apartment 2C, Skokie, Illinois.  The address provided for the Manager is 4905 Crain Street, Skokie, Illinois.

### C.     MEDICARE PROGRAM

13.     Medicare is a federal health benefit program administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

14.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). These BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. In the past, BINs were composed of either a beneficiary's Social Security Number or randomly selected numbers and letters.  Since 2015, Congress mandated CMS phase out the use of Social Security Numbers, and CMS now assigns Medicare beneficiaries a randomly generated number called a Medicare Beneficiary Identifier ("MBI"). One purpose of

this change was to improve patient identity protection and prevent identity theft. These BINs are considered means of identification pursuant to 18 U.S.C. § 1028(d)(7).

15.    Medicare, as well as private health care benefit programs are "health care benefit programs" as defined by Title 18, United States Code, § 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual…" 18 U.S.C. § 24(b).

16.    Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

17.    Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care and that the service was medically necessary for the health and/or well-being of the patient. Health care suppliers, like LUNA LABS LLC, are paid by Medicare through the submission of claims. All Medicare providers are required to submit claims electronically. Those claims are processed through Baltimore, Maryland, and therefore they travel in interstate commerce. Medicare reimburses claims electronically, as well, and payments for Medicare Part A services in Illinois are issued from National Government Services,

a Medicare Administrative Contractor (MAC) headquartered in Indianapolis, Indiana. Payments are made to a provider's bank account through an electronic funds transfer. Providers are also required to maintain all documents that substantiate Medicare claims for at least six years.

18. As of June 15, 2023, a review of the PECOS system revealed that LUNA LABS LLC is actively enrolled with Medicare. Therefore, at all relevant times, LUNA LABS LLC was bound by the laws, rules, and regulations that govern Medicare.

### D. OVER THE COUNTER (OTC) COVID-19 TEST KITS

19. In April 2022, the federal government announced that Medicare beneficiaries could receive up to eight OTC COVID-19 tests per calendar month from participating pharmacies and health care providers, for the duration of the COVID-19 public health emergency ("PHE"), at no cost to beneficiaries. The PHE ended on May 11, 2023, and Medicare stopped paying for the OTC COVID-19 tests. Medicare allowed, however, a one-year grace period for providers to bill OTC COVID-19 tests that were provided to beneficiaries prior to the May 11, 2023 deadline.

20. In order to receive reimbursement from Medicare for the OTC COVID-19 tests, providers were directed to bill Medicare using Healthcare Common Procedure Code System ("HCPCS") code K1034 for the OTC COVID-19 tests. CMS's guidance to providers billing for these OTC COVID-19 tests was to "Keep good documentation. We may ask to see documentation showing a patient's request for tests. If you don't provide the documentation, we could recoup payment and may take

7

other administrative actions."[2]

IV.   **EVIDENCE IN SUPPORT OF PROBABLE CAUSE TO SEIZE FUNDS IN SUBJECT BANK ACCOUNTS**

21.     The FBI and the United States Department of Health and Human Services, Office of Inspector General (HHS-OIG), are investigating allegations that LUNA LABS LLC has, from approximately March 7, 2023 to the present, fraudulently submitted claims for government funds through the Medicare program.

22.     As discussed in greater detail below, the investigation has revealed that LUNA (1) submitted claims via interstate wire transmissions for reimbursement through Medicare for OTC COVID-19 tests for patients that never received the tests; and (2) submitted claims to Medicare for OTC COVID-19 tests that were delivered to Medicare beneficiaries that did not agree to, or approve of, the delivery of OTC COVID-19 tests to their homes.

23.     According to Medicare claims data, LUNA LABS LLC billed Medicare almost exclusively (over 99% of their claims to Medicare) for OTC COVID-19 tests using HCPCS code K1034.  HCPCS code K1034 is defined as: "Provision of COVID-19 test, nonprescription self-administered and self-collected use, FDA approved, authorized or cleared, one test count."

24.     According to Medicare claims data, between March 7, 2023 and June 9, 2023, LUNA LABS LLC billed approximately $69,832,800 for OTC COVID-19 test

---

[2] https://www.cms.gov/COVIDOTCtestsProvider, accessed on June 21, 2023. The website was last modified on May 12, 2023.

kits for which it was paid approximately $31,474,228.80. The dates of service for these claims were between February 27, 2023 and May 11, 2023.

25.     In summary, according to witnesses and records obtained by law enforcement, LUNA LABS LLC listed a practice location at an office space located at 537 West Rise Road, Schaumburg, Illinois.  LUNA LABS LLC improperly billed Medicare for OTC COVID-19 tests though various means, including (1) charging Medicare for OTC COVID-19 tests for patients who never received the OTC COVID-19 tests; and (2) charging Medicare for OTC COVID-19 tests that were delivered to Medicare beneficiaries who did not agree to, or approve of, the delivery of OTC COVID-19 tests to their homes.

26.     According to information received from Medicare, reimbursements from Medicare to LUNA LABS LLC were deposited into **Subject Bank Account 1.**

27.     A review of **Subject Bank Account 1** found that funds from **Subject Bank Account 1** were transferred to **Subject Bank Account 2** and **Subject Bank Account 3**.  Funds from **Subject Bank Account 2** were transferred again to **Subject Bank Account 4** and **Subject Bank Account 5**.

28.     Based on the facts and circumstances set forth below, I submit that there exists probable cause to believe that the **Subject Funds** on deposit in the **Subject Bank Accounts** are:

        a.     Funds traceable to, and are therefore proceeds of, wire fraud and health care fraud, committed in violation of 18 U.S.C. 1343 and 1347, and are therefore subject to civil forfeiture under 18 U.S.C. 1956(c)(7) and 1961(1), and

9

subject to criminal forfeiture under 28 U.S.C. 2461(c);

      b.    Funds involved in or traceable to money laundering offenses, committed in violation 18 U.S.C. 1957, and therefore are subject to civil forfeiture under 18 U.S.C. 981(a)(1)(A) and 984, and subject to criminal forfeiture under 18 U.S.C. 982(a)(1); and

      c.    Subject to seizure for purposes of civil forfeiture under 18 U.S.C. 981(b) and for purposes of criminal forfeiture under 18 U.S.C. 982(b)(1) and 21 U.S.C. 853(f).

### A.    BENEFICIARY COMPLAINTS AND INTERVIEWS

29.    Beginning on approximately March 15, 2023, Medicare began receiving calls by Medicare beneficiaries to Medicare's complaint telephone number, 1-800-MEDICARE. The number dials to a call center where Medicare contracted employees receive complaints from the public regarding any Medicare related issue including Medicare fraud, waste and abuse or quality of care issues. Between March 15, 2023, and June 18, 2023, Medicare received approximately 4,081 beneficiary complaints listing LUNA LABS LLC as the subject of the complaint. From these 4,081 complaints, 1,341 report that the Medicare beneficiary received no services from LUNA LABS LLC. Investigators subsequently interviewed Medicare beneficiaries.

      I.    Medicare beneficiary S.P.

30.    On June 14, 2023, investigators interviewed Medicare beneficiary S.P., who resides in Illinois. S.P. denied receiving any over-the-counter (OTC) COVID-19 testing strips in the mail. Further, S.P. denied requesting any OTC COVID-19

testing strips, and never received phone calls asking whether S.P. wanted any OTC COVID-19 testing strips. Based on a review of Medicare claims data, LUNA LABS LLC was one of the agencies that billed K1034 for the delivery of OTC test kits to S.P. LUNA LABS LLC submitted a claim to Medicare for S.P. on or about April 13, 2023 and was paid $94.08.

### II.    Medicare beneficiary K.H.

31.    On June 15, 2023, investigators interviewed Medicare beneficiary K.H., who resides in Illinois. During a recent review of K.H.'s Medicare benefits statement, K.H. observed that an entity called LUNA LABS LLC billed Medicare for delivering OTC COVID-19 test kits to K.H.  K.H. told the investigator he/she never received an OTC COVID-19 test kit, and never requested an OTC COVID-19 test kit.  K.H. explained that he/she had never heard of LUNA LABS LLC. K.H. tried to contact LUNA LABS LLC by telephone after seeing their name on his/her Medicare benefits statement, and K.H. was unsuccessful getting a hold of anyone. Based on a review of Medicare claims data, LUNA LABS LLC was one of the agencies that billed K1034 for the delivery of OTC COVID-19 test kits to K.H. LUNA LABS LLC submitted a claim to Medicare for K.H. on or about May 12, 2023 and was paid $94.08.

### III.    Medicare beneficiary I.W.

32.    On June 15, 2023, investigators interviewed Medicare beneficiary I.W., who resides in North Carolina.  I.W. filed three complaints with CMS after noticing that approximately ten agencies, including LUNA LABS LLC , were billing Medicare under I.W.'s name for OTC COVID-19 test kits that I.W. either did not receive, or did

not request. I.W. acknowledged receiving four packages in the mail from unknown senders through distribution companies in Florida and New Jersey. The first package arrived on or about May 1, 2023. I.W. opened the package to examine its contents and found an OTC COVID-19 test kit. Having not requested the OTC COVID-19 test kit, I.W. attempted to return the package to its sender, but the post office would not return the package, as it had been opened. An additional three packages arrived in the ensuing weeks, all from unknown senders, with the most recent package delivered on May 19, 2023. I.W. promptly returned all three of these additional packages because I.W. did not request them and did not open them. According to I.W., his/her Medicare benefits statement indicated that the OTC COVID-19 test kit from LUNA LABS LLC was delivered on April 6, 2023, nearly one month before I.W.'s first package arrived. Based on a review of Medicare claims data, LUNA LABS LLC was one of the agencies that billed K1034 for the delivery of OTC COVID-19 test kits to I.W. LUNA LABS submitted a claim to Medicare for I.W. on or about April 7, 2023, and was paid $94.08.

IV.     Medicare beneficiary H.W.

33.     On June 15, 2023, investigators interviewed Medicare beneficiary H.W., who acknowledged complaining to Medicare about false billing submitted under H.W.'s name. H.W. discovered the issue during a recent trip to the library, where H.W. uses a public computer to access his/her Medicare statements. During a recent review, H.W. found that Medicare was being billed for OTC COVID-19 test kits that H.W. never received. H.W. told the investigator that he/she did not request the OTC

COVID-19 test kits, as he/she believed he/she could get them for free at the local library. Based on a review of Medicare claims data, LUNA LABS LLC was one of the agencies that billed K1034 for the delivery of OTC COVID-19 test kits to H.W. LUNA LABS LLC submitted a claim to Medicare for H.W. on or about May 12, 2023 and was paid $94.08.

### B. BILLING OF DECEASED BENEFICIARIES

34.     An analysis of LUNA LABS LLC's billing records by Medicare indicate that LUNA LABS LLC billed for services from March 16, 2023 to June 5, 2023 for approximately 744 deceased beneficiaries.  The following are examples of individuals with a date of service after their death that were billed by LUNA LABS LLC.

| Beneficiary | Alleged Date of Service | Date of Death | Billed Amount | Paid Amount |
|---|---|---|---|---|
| R.H. | 4/17/2023 | 6/30/1965 | $200.00 | $0.00 |
| J.B. | 4/26/2023 | 10/21/2018 | $200.00 | $0.00 |
| J.W. | 4/26/2023 | 1/12/2019 | $200.00 | $0.00 |
| E.M. | 4/26/2023 | 3/17/2019 | $200.00 | $0.00 |
| M.C. | 4/26/2023 | 3/22/2019 | $200.00 | $0.00 |

35.     In total, LUNA LABS LLC attempted to bill Medicare approximately $148,800 for 744 services of purportedly supplying OTC COVID-19 tests after beneficiaries' dates of death.  Medicare only paid LUNA LABS LLC approximately $658.56 for seven (7) services, however, as the Medicare system identified most

individuals whose dates of death preceded the purported date of service and denied the claims.

36.     Based on my training and experience, Medicare providers who repeatedly bill for services purportedly provided to dead beneficiaries often are using Medicare beneficiary information that has been purchased or unlawfully transferred, rather than collected in the ordinary course of their provision of bona fide medical services to beneficiaries.  Based on my training and experience, repeated billing of services to dead beneficiaries is an indicator that the entity is engaged in fraudulent billing for services that are not medically necessary, and/or not actually provided.

### C.    SURVEILLANCE OF LUNA LABS LLC OFFICE LOCATION

37.     On approximately June 5, 2023, an agent conducted a site visit at the office location of LUNA LABS LLC, located at 537 West Wise Road, Schaumburg, Illinois.  During the site visit, the agent observed outward signage indicating the presence of LUNA LABS LLC.  A photograph taken during the site visit is provided below as Image 1.



*Image 1*

38.     The agent further observed a piece of paper taped to the door instructing FedEx, UPS and Amazon to delivery packets next door, to the VIP Auto Body shop. The agent did not observe anyone inside the premises, as the blinds were closed.

### D.     MEDICARE CLAIMS DATA ANALYSIS

39.     Medicare claims data for the week of June 20, 2023, indicated that between March 7, 2023 and June 9, 2023, a period of only about 13 weeks, LUNA LABS LLC billed approximately $69,832,800 to Medicare and was paid approximately $31,474,228.80. The billing was submitted using LUNA LABS LLC's NPI number.  Those claims account for OTC COVID-19 tests purportedly delivered to approximately 347,164 Medicare beneficiaries.  These claims included services

15

billed by LUNA LABS LLC for 744 Medicare beneficiaries that were deceased at the time of the service.

40.     Prior to March 7, 2023, LUNA LABS LLC never billed for HCPCS K1034. LUNA LABS LLC's billing for OTC COVID-19 tests under K1034 began on March 7, 2023, just four days after Illinois Secretary of State records initially indicate that BAQAR HUSSAIN RAZV SYED became the sole "Manager" of LUNA LABS LLC. Prior to March 7, the only claims submitted to Medicare were for approximately 78 beneficiaries. These claims were submitted between July 25, 2022 and January 12, 2023 and were for a total of approximately 619 claims that occurred between March 15, 2022 and December 27, 2022. LUNA LABS LLC was paid approximately $26,737.67 for these claims. Meaning, from the date of incorporation, January 17, 2022, until July 25, 2022, LUNA LABS LLC did not bill Medicare.

41.     Having never billed for HCPCS K1034 prior to March 7, 2023, LUNA LABS LLC billed K1034 at an alarming rate. The chart below depicts the day-by-day billing by LUNA LABS LLC of HCPCS Code K1034.

| Claim Submission Date | Number of Claims | Number of OTC Covid-19 Test Kits | Billed Amount | Paid Amount |
|---|---|---|---|---|
| **March** | **24,247** | **193,976** | **$4,849,400.00** | **$2,235,387.84** |
| 3/7/2023 | 99 | 792 | $19,800.00 | $9,125.76 |
| 3/10/2023 | 3,196 | 25,568 | $639,200.00 | $285,768.00 |
| 3/13/2023 | 405 | 3,240 | $81,000.00 | $37,537.92 |
| 3/14/2023 | 984 | 7,872 | $196,800.00 | $91,351.68 |
| 3/16/2023 | 1,944 | 15,552 | $388,800.00 | $179,316.48 |
| 3/17/2023 | 986 | 7,888 | $197,200.00 | $91,539.84 |
| 3/20/2023 | 986 | 7,888 | $197,200.00 | $91,163.52 |
| 3/21/2023 | 1,763 | 14,104 | $352,600.00 | $162,852.48 |
| 3/22/2023 | 1,762 | 14,096 | $352,400.00 | $164,263.68 |

16

| Claim Submission Date | Number of Claims | Number of OTC Covid-19 Test Kits | Billed Amount | Paid Amount |
|---|---|---|---|---|
| 3/23/2023 | 1,768 | 14,144 | $353,600.00 | $164,640.00 |
| 3/27/2023 | 3,394 | 27,152 | $678,800.00 | $315,920.64 |
| 3/29/2023 | 861 | 6,888 | $172,200.00 | $79,309.44 |
| 3/30/2023 | 2,675 | 21,400 | $535,000.00 | $247,242.24 |
| 3/31/2023 | 3,424 | 27,392 | $684,800.00 | $315,356.16 |
| **April** | **111,420** | **891,360** | **$22,284,000.00** | **$10,162,897.92** |
| 4/3/2023 | 1,670 | 13,360 | $334,000.00 | $148,270.08 |
| 4/5/2023 | 1,722 | 13,776 | $344,400.00 | $158,618.88 |
| 4/6/2023 | 1,788 | 14,304 | $357,600.00 | $165,204.48 |
| 4/7/2023 | 1,782 | 14,256 | $356,400.00 | $163,511.04 |
| 4/10/2023 | 5,918 | 47,344 | $1,183,600.00 | $545,852.16 |
| 4/11/2023 | 5,790 | 46,320 | $1,158,000.00 | $530,046.72 |
| 4/12/2023 | 6 | 48 | $1,200.00 | $0.00 |
| 4/13/2023 | 5,700 | 45,600 | $1,140,000.00 | $527,036.16 |
| 4/14/2023 | 11,869 | 94,952 | $2,373,800.00 | $1,093,585.92 |
| 4/17/2023 | 7,876 | 63,008 | $1,575,200.00 | $726,956.16 |
| 4/18/2023 | 2,640 | 21,120 | $528,000.00 | $241,691.52 |
| 4/19/2023 | 14,025 | 112,200 | $2,805,000.00 | $1,277,700.48 |
| 4/20/2023 | 7,164 | 57,312 | $1,432,800.00 | $659,971.20 |
| 4/21/2023 | 7,051 | 56,408 | $1,410,200.00 | $651,692.16 |
| 4/24/2023 | 11,794 | 94,352 | $2,358,800.00 | $1,090,951.68 |
| 4/25/2023 | 2,685 | 21,480 | $537,000.00 | $248,653.44 |
| 4/26/2023 | 2 | 16 | $400.00 | $0.00 |
| 4/27/2023 | 21,933 | 175,464 | $4,386,600.00 | $1,933,155.84 |
| 4/28/2023 | 5 | 40 | $1,000.00 | $0.00 |
| **May** | **213,419** | **1,707,352** | **$42,683,800.00** | **$19,075,660.80** |
| 5/1/2023 | 21,832 | 174,656 | $4,366,400.00 | $1,962,320.64 |
| 5/2/2023 | 3 | 24 | $600.00 | $94.08 |
| 5/3/2023 | 4 | 32 | $800.00 | $0.00 |
| 5/5/2023 | 12 | 96 | $2,400.00 | $0.00 |
| 5/8/2023 | 36,024 | 288,192 | $7,204,800.00 | $3,322,717.44 |
| 5/9/2023 | 26,937 | 215,496 | $5,387,400.00 | $2,387,656.32 |
| 5/10/2023 | 11,050 | 88,400 | $2,210,000.00 | $988,592.64 |
| 5/11/2023 | 82,573 | 660,584 | $16,514,600.00 | $7,222,239.36 |
| 5/12/2023 | 21,408 | 171,264 | $4,281,600.00 | $1,965,895.68 |
| 5/15/2023 | 11,920 | 95,360 | $2,384,000.00 | $1,089,916.80 |
| 5/16/2023 | 1,494 | 11,952 | $298,800.00 | $135,945.60 |

| Claim Submission Date | Number of Claims | Number of OTC Covid-19 Test Kits | Billed Amount | Paid Amount |
|---|---|---|---|---|
| 5/17/2023 | 22 | 176 | $4,400.00 | $0.00 |
| 5/18/2023 | 30 | 240 | $6,000.00 | $0.00 |
| 5/19/2023 | 21 | 168 | $4,200.00 | $0.00 |
| 5/22/2023 | 10 | 80 | $2,000.00 | $0.00 |
| 5/23/2023 | 17 | 136 | $3,400.00 | $94.08 |
| 5/24/2023 | 16 | 128 | $3,200.00 | $94.08 |
| 5/25/2023 | 18 | 144 | $3,600.00 | $0.00 |
| 5/26/2023 | 9 | 72 | $1,800.00 | $0.00 |
| 5/30/2023 | 15 | 120 | $3,000.00 | $94.08 |
| 5/31/2023 | 4 | 32 | $800.00 | $0.00 |
| **Jun** | **78** | **624** | **$15,600.00** | **$282.24** |
| 6/1/2023 | 7 | 56 | $1,400.00 | $94.08 |
| 6/2/2023 | 9 | 72 | $1,800.00 | $94.08 |
| 6/5/2023 | 4 | 32 | $800.00 | $94.08 |
| 6/6/2023 | 16 | 128 | $3,200.00 | $0.00 |
| 6/7/2023 | 5 | 40 | $1,000.00 | $0.00 |
| 6/8/2023 | 9 | 72 | $1,800.00 | $0.00 |
| 6/9/2023 | 28 | 224 | $5,600.00 | $0.00 |
| **Grand Total** | **349,164** | **2,793,312** | **$69,832,800.00** | **$31,474,228.80** |

42.     A review of this chart illustrates that LUNA LABS LLC conducted a large percentage of their billing, for millions of dollars, over the course of thirteen weeks. Based on my training and experience, dramatic spikes in billing over limited periods of time are uncommon and indicative of potentially fraudulent activity.

## E.     REVIEW OF FINANCIAL RECORDS

43.     Financial records showed that between on or about January 1, 2023 and May 31, 2023, approximately $14,408,777.83 was deposited into **Subject Bank Account 1** from Medicare. A review of Medicare claims data showed that

approximately $31,473,196.09[3] was paid to LUNA LABS LLC during this same time-period.[4]

44.     A detailed review was conducted to assess the financial activity in **Subject Bank Account 1** as it related to OTC COVID-19 tests purportedly provided by LUNA LABS LLC from February 2023 to May 2023. Bank statements revealed that, for the months of January 2023 to February 2023, deposits into **Subject Bank Account 1** averaged $10,349.24 and debit activity averaged $102,991.68. At the end of February 2023, **Subject Bank Account 1** contained a balance of $0.00. Based on my training and experience, a low account balance with comparatively small amounts of funds moving in and out of the account would not logistically support a legitimate business planning a multi-million dollar spike in its lab testing business the following month.

45.     Further review of **Subject Bank Account 1** revealed that deposit and debit activity increased in March 2023, which is consistent with LUNA LABS LLC's surge in billing for OTC COVID-19 tests.  Continued analysis of debit activity in **Subject Bank Account 1** for the period of March 2023 to May 2023, however, does not reflect financial activity indicative of a legitimate lab business. A detailed review was unable to conclusively identify a large and consistent stream of expenses tied to

---

[3] From this amount, approximately $31,472,817.60, or over 99.9% of its billing during the referenced time period, was billed by LUNA LABS LLC under HCPCS K1034.
[4] The difference between the two amounts is due to reconciliation of payment records between JP Morgan Chase bank records, which are on delay, and Medicare payment records, which are real-time records.

business activities typically expected with the operation of OTC COVID-19 testing, such as test kit purchases, shipping and packaging fees, and/or storage fees. There was one limited expense, totaling $1,600, that could be conclusively attributed to rent payments in the calendar year of 2023.

46. Moreover, LUNA LABS LLC financial records show a pattern of rapidly disbursing funds received from fraudulent Medicare payments received into **Subject Bank Account 1**, often times into bank accounts that are controlled by the subject or related entities, including **Subject Bank Account 2**, **Subject Bank Account 3**, **Subject Bank Account 4**, and **Subject Bank Account 5.**

47. **Subject Bank Account 2**, **Subject Bank Account 3**, and **Subject Bank Account 4** are held under the account name HEALTH CARE MANAGEMENT & MARKETING LLC. As previously referenced, Illinois Secretary of State records list SYED BAQAR HUSSAIN RAZV as the "Registered Agent" and "Manager" of HEALTH CARE MANAGEMENT & MARKETING LLC.

48. **Subject Bank Account 5** is held under the name BAQAR HUSSAIN RAZV SYED.

49. Between March 2023 and May 2023, LUNA LAB LLC sent check payments, wire transfers, and electronic funds transfers to **Subject Bank Account 2** and **Subject Bank Account 3.**

50. On April 18, 2023, $500,000 was transferred from **Subject Bank Account 1** to **Subject Bank Account 3**, by way of a "Domestic Wire Transfer." Given the lack of an apparent business relationship between the two entities, as well

as the shared ownership by BAQAR HUSSAIN RAZV SYED, this transfer indicates an attempt to conceal and shield the fraudulently obtained Medicare deposits.

51.    **Subject Bank Account 2** appears to be a pass through account for the flow of Medicare funds derived from the practice of billing Medicare for OTC Covid-19 test kits that were not delivered or requested.  Funds from **Subject Bank Account 2** were transferred to **Subject Bank Account 4**, and **Subject Bank Account 5**.

52.    A review of **Subject Bank Account 2** indicated that between April 3, 2023 and May 31, 2023, approximately $11,732,201.42 was transferred from **Subject Bank Account 1 to Subject Bank Account 2**. Total deposits into Subject Bank Account 2 during the relevant period was approximately $12,955,651.42. Thus, deposits from **Subject Bank Account 1** account for approximately 91% of all deposits into **Subject Bank Account 2** during this period.

53.    Further review of **Subject Bank Account 2** for the period April 3, 2023 and May 31, 2023 showed that the funds in the account were rapidly depleted into entities controlled by BAQAR HUSSAIN RAZV SYED. Funds totaling $900,000 were transferred by four electronic funds transfers from **Subject Bank Account 2** to **Subject Bank Account 5** in **May 2023.**

54.    On June 12, 2023, a $2,828,492.97 cashier's check drawn off **Subject Bank Account 2** was deposited in **Subject Bank Account 4.**

55.    Based on my training and experience and my knowledge of this investigation, I believe LUNA LABS LLC engaged in a widespread practice of billing

Medicare for OTC COVID-19 test kits that were never delivered to, or not requested by, Medicare patients. Therefore, there is probable cause to believe that the funds that Medicare deposited into **Subject Bank Account 1**, some of which was subsequently transferred to **Subject Bank Account 2, Subject Bank Account 3, Subject Bank Account 4** and **Subject Bank Account 5,** were obtained in violation of the **Subject Offenses.**

### F. CONCLUSION

56. Based on the foregoing, I respectfully submit there is probable cause to believe the **Subject Funds** contained in the **Subject Bank Accounts** are subject to seizure because they are property constituting and derived from proceeds of the **Subject Offenses**. I therefore respectfully request that this Court issue seizure warrants for the **Subject Funds**, with a maximum seizure amount of $31,474,228.80 for the **Subject Bank Account 1,** $11,732,201.42 from **Subject Bank Account 2;**

$500,000 from **Subject Bank Account 3**, $2,828,492.97 from **Subject Bank Account 4**, and $900,000 from **Subject Bank Account 5**.

FURTHER AFFIANT SAYETH NOT

*Karl Kraywinkle*

_____

KARL D. KRAYWINKLE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and affirmed by telephone
on June 23, 2023

_____

Honorable Jeffrey Cole
United States Magistrate Judge

23